USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/3/2025____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH P. HICKEY, *et al.*,

                     Plaintiff,

           -against-

JOSEPH P. SMITH, *et al.*,

                    Defendants.

---

1:23-cv-02538-MKV

**OPINION AND ORDER
GRANTING MOTION TO
DISMISS OR STAY SECOND
AMENDED COMPLAINT**

**MARY KAY VYSKOCIL, United States District Judge:**

Plaintiffs Joseph P. Hickey and Laurel Ulrich, individually and as guardian for her two minor children, (together, "Plaintiffs") bring this action against Defendants Joseph P. Smith, Joseph J. Grillo, Richard F. Passarelli, Joseph C. Phair, BV at JFK, Inc. ("Kennedy BV"), JJJ&R Corporation ("Park Avenue BV"), C. Smith Corporation ("Times Square BV"), Strathroy Park Corporation ("New York Avenue BV"), J. Caldwell Corporation ("J. Caldwell BV"), Veronica & Josephine Corporation ("Veronica BV"), and R.J.J.J. Restaurant Corporation ("White House BV") (collectively, the "Restaurant Defendants" and together with Smith, Grillo Passarelli, and Phair, "Defendants"), to recover alleged fraudulently obtained and transferred ownership interests and withheld income distributions related to several Bobby Van's Restaurants in which Plaintiffs purportedly were minority shareholders.

Defendants move to dismiss Plaintiffs' Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, failure to meet the heightened fraud pleading standard under to Rule 9(b) of the Federal Rules of Civil Procedure, because the claim is time-barred, and to dismiss or stay this action in favor of arbitration. Defendants' motion to stay is GRANTED and this case is stayed pending arbitration.

## FACTUAL BACKGROUND

### I.   Bobby Van's Restaurants

In the early 1990s, Plaintiff Joseph Hickey and Defendants Joseph Smith, Richard Passarelli, and Joseph Phair founded the first Bobby Van's Restaurant in Bridgehampton, New York. *See* [ECF No. 94 ("Second Amended Complaint" or "SAC") ¶ 20].[1] Over the years, the partners opened several restaurants operating under the trade name "Bobby Van's" in New York and Washington, D.C. SAC ¶ 24. Joseph Grillo served as the accountant and financial advisor for the restaurants. SAC ¶ 4. Prior to 2014, Hickey maintained ownership interests in various restaurants, including 24.5% in Park Avenue BV; 15.25% in Times Square BV; 14.0% in Herbert Street LLC; 16.5% in J. Caldwell BV; 14.50% in White House BV; 15.125% in New York Avenue BV; 17.25% in Veronica BV; 24.00% in Kennedy BV. SAC ¶¶ 21, 24.

In 2014, Hickey transferred his 24% ownership interest in Kennedy BV to his two minor children with Plaintiff Laurel Ulrich as their guardian. SAC ¶ 27. In 2016, Hickey sold his interest in Bridgehampton BV and Herbert Street LLC to two of his fellow co-founders, Phair and Smith, respectively. SAC ¶ 28.  In 2017 and 2021, Hickey signed two further agreements involving his remaining shares in the Bobby Van's restaurants. The true effect of those two agreements is the central question of this dispute.

### II.   The 2017 Stock Purchase Agreement

In May 2017, Smith and Phair informed Hickey that they were negotiating with a third party who was interested in purchasing some or all the Bobby Van's restaurants if they could reach an agreement with Hickey regarding compensation for the sale of his ownership interest (not including the ownership interests of his two minor children in Kennedy BV). SAC ¶ 30. In the

---

[1] The facts as stated herein are based on Plaintiffs' allegations in the Second Amended Complaint and are accepted as true for the purposes of the motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

same month, Hickey met Phair and Smith at the law offices of the attorney representing Smith and Phair, and signed the "Stock Purchase Agreement" (the "2017 SPA") after Smith and Phair made several oral representations about the meaning of the agreement. SAC ¶¶ 31, 42; *see* ECF No. 94-1 ("2017 SPA" or the "2017 Agreement"). The 2017 SPA is signed by Hickey, Phair and Smith and identifies Hickey as the "Seller" and Phair and Smith as the "Purchasers." 2017 SPA at 5. The SPA states that "the Seller desires to sell said [Park Avenue BV] stock." 2017 SPA at 1. The "Purchase and Sale" section or Paragraph One of the 2017 SPA states that "the Seller shall sell, convey, transfer and deliver to Purchasers certificates representing such stock, and the Purchasers shall purchase from the Seller [the Park Avenue BV] Stock[.]" 2017 SPA ¶ 1. The consideration for the purchase of Hickey's Park Avenue BV shares is set out in an exhibit to the 2017 SPA. 2017 SPA ¶ 2, Exhibit A. The exhibit provides that the sum of $100,000 would be "delivered to Seller upon the execution of this Agreement" and three additional payments of the same would be made to Hickey at specified dates over the next three years. *Id.*

Paragraph Five or the "Option to Purchase Shares of Stock and Interest or the Option" dictates that "Seller hereby grants Purchasers an irrevocable option." 2017 SPA ¶ 5. That option would be "exercisable upon the receipt of $100,000 sale of the [Park Avenue BV] stock" at which time "the Seller shall release any and all right, title and interest he may have in the name 'Bobby Van's'." *Id.* Thereafter, if the "Purchasers," Smith and Phair, entered into a transaction to sell their interests in the "Option Stores,"[2] Smith and Phair could exercise the option by paying Hickey $600,000. *Id.* If Smith and Phair did not sell their interest in the "Option Stores," "within 36

---

[2] The term "Option Stores" is never defined in the 2017 SPA. *See* 2017 SPA. However, the requirement that Hickey release all "right, title and interest" in the name "Bobby Van's", suggests that Hickey would be required to give up his interest in all five of the stores in addition to Park Avenue BV in which he maintained an interest—Times Square BV, J. Caldwell BV, White House BV, New York Avenue BV, and Veronica BV.

months" of the Agreement, Hickey and Phair could "exercise the Option by paying to [Hickey] $400,000." *Id.*

Smith and Phair made the following oral representations to Hickey before he signed the 2017 SPA:

- The written provisions of the 2017 SPA providing for the sale of Hickey's interest in Park Avenue BV were void by agreement of the parties, and Hickey would retain his stock certificates until the options were exercised and he was paid in full. SAC ¶¶ 35, 40, 42.

- In lieu of Hickey selling his ownership in Park Avenue BV under Paragraph One, Smith and Phair would pay Hickey $100,000 for the Option Right to purchase Hickey's Park Avenue BV shares and if the Option Right was never exercised, Hickey would keep the $100,000 and his ownership shares. *See id.* at ¶ 36. Smith and Phair could purchase the Park Avenue BV shares by paying Hickey $600,000. SAC ¶ 37.

- Paragraph Five created an option for Phair and Smith to purchase Hickey's shares in the other five restaurants, which they could only exercise after paying Hickey $600,000. SAC ¶ 36.

Plaintiffs allege that these statements were "material misrepresentations that go[] to the basic nature of the [2017 SPA]" because Smith and Phair have "subsequently disavowed" these terms and claimed ownership rights over all of Hickey's remaining shares in the Bobby Van's restaurants. SAC ¶¶ 38, 42.

The corporate bylaws of each of the Restaurant-Defendants require any selling shareholder to endorse his stock certificates and to register such with the affected corporation. SAC ¶ 34. Hickey believed that adhering to this bylaw requirement would protect against improper or fraudulent stock transfers because individual companies would not register a transfer of ownership

4

if the stock certificates were not properly endorsed. *Id.* Hickey never did endorse his stock certificates. SAC ¶¶ 40, 42(e), 115.

The signed 2017 SPA contains an arbitration clause that specifies that any disputes arising out of or relating to the Agreement must be resolved in arbitration in New York. See 2017 SPA ¶ 7(b). It states, "[a]ny dispute, claim or controversy arising out of or relating to this Agreement. . . including the scope of applicability of this Agreement to arbitrate, shall be determined by arbitration in New York, New York[.]" *Id.*

After signing the 2017 SPA, Smith told Hickey that he and Phair were negotiating for the sale of the restaurants, but no progress has been made. SAC ¶ 43.

## III.    The 2017 Exchange Agreement

Unbeknownst to Hickey, Smith and Phair had agreed with Passarelli to divide up Hickey's shares among themselves at the same time they presented Hickey with the 2017 SPA. SAC ¶ 47. About three months after Hickey signed the 2017 SPA, Passarelli, Phair, and Smith entered into an "Exchange Agreement," (the "2017 Exchange Agreement") in which they sought to transfer Hickey's shares in Park Avenue BV to Passarelli in exchange for Passarelli's own interests in other Bobby Van's locations. SAC ¶¶ 48-50; *see* ECF No. 94-2 at 2 ("2017 Exchange Agreement").

After the 2017 Exchange Agreement, Smith told Hickey that the 2017 income distributions for the restaurants would be made in the normal course of business. SAC ¶ 44. Smith indicated that nothing had changed after the 2017 SPA was signed except that Hickey had received the $100,000 for the Option right which had not been exercised and he could expect to receive his usual income distributions from the restaurant. SAC ¶ 44. Smith, Passarelli, and Phair did not tell Hickey that all of his ownership shares had been divided among themselves and they had changed the corporate records to reflect that Hickey no longer had any ownership interests. SAC ¶ 51. Grillo, the accountant and financial advisor for Bobby Van's Restaurants, and Smith told Hickey's

accountant that business revenues from the restaurants had dropped to explain that distribution from the 2017 earnings were delayed. SAC ¶ 54.

About a year after the 2017 SPA was signed, Smith informed Hickey that he and Phair were terminating the 2017 SPA and they would not pay Hickey beyond the $100,000 that had been promised under the Agreement. SAC ¶ 45. Smith represented that attempts to sell the Bobby Van's restaurants had fallen through and they would not continue to try to sell them. *Id.* At some point, Smith, Phair and Passarelli "cut off all contact with Hickey." SAC ¶ 54.  In 2019, Hickey sent an email to Smith, Passarelli, and Phair confirming that the 2017 Option Agreement had been voided and that he was still expecting his distributions from 2017 forward. SAC ¶¶ 55.  In 2020, Smith and Phair again entered into an agreement to exchange shares amongst themselves ("2020 Smith-Phair Agreement") and did not inform Hickey of the exchange. SAC ¶ 56.

**IV.    2021 Amended Stock Purchase Agreement**

In 2020, Hickey hired an attorney to attempt to recover his ownership shares and past distributions that he believed were due to him since 2017. SAC ¶ 57.  This counsel engaged in settlement discussions with Smith and Grillo. SAC ¶ 58. During this time, Smith and Grillo contacted Hickey without the knowledge of Hickey's counsel, told Hickey to keep the communication secret from his attorney, and stated that the restaurants had no operating funds and had little chance of staying open. SAC ¶ 59. They told Hickey he would not be paid his income distributions in future years, but Smith stated that "on a now or never basis" he would pay Hickey $200,000 for his ownership interests in five of the six Bobby Van's restaurants that were the subject of the 2017 SPA, excluding Park Avenue BV. *Id.* Smith and Grillo did not disclose that these restaurants received $4.5 million in PPP funds. *Id.*

Based on these representations, Hickey signed an "Amended Stock Purchase and Sale Agreement" (the "2021 ASPA") with Smith. *See Id.*; ECF No. 94-3 ("2021 ASPA").  Recognizing

that "certain purchase terms from the [2017 SPA] remain unfulfilled," the 2021 ASPA purported to be "a definitive superseding agreement for the sale and purchase of [Hickey's] Ownership Interest" in the five restaurants. 2021 ASPA at 1. Smith paid Hickey $200,000 under the agreement. SAC ¶ 60. The 2021 ASPA contains an arbitration clause that specifies that "[a]ny dispute or claim arising hereunder" must be resolved in arbitration in New York. *See* 2021 ASPA ¶ 14.

Plaintiffs assert that 2021 ASPA did not settle or in any way involve Hickey's legal claims for unpaid income distributions for his ownership interests in the five restaurants for 2017–2020, his ownership interests in Park Avenue BV, the ownership rights of Plaintiffs' minor children in Kennedy BV, or their legal claims for unpaid income distributions from Kennedy BV. SAC ¶¶ 61-62.

## PROCEDURAL HISTORY

Plaintiffs commenced this action by filing a Complaint in the United States District Court for the District of Columbia. [ECF No. 1]. Plaintiffs timely filed an Amended Complaint as of right pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure. [ECF No. 12]. Defendants Smith, Grillo, and all Restaurant Defendants except Park Avenue BV moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be granted, and Rule 12(b)(3), for improper venue, arguing that the arbitration clauses in the 2017 SPA and the 2021 ASPA mandate the arbitration of Plaintiffs' claims, including as to the issue of arbitrability. [ECF No. 30]. Defendants Passarelli and Park Avenue BV filed a separate motion to dismiss on the same grounds. [ECF No. 31]. Defendant Phair filed an answer, invoking the arbitration clauses as an affirmative defense. [ECF No. 52].

The D.C. District Court issued a memorandum opinion on the motions to dismiss, holding that "at least some of Hickey's claims must be presented to an arbitrator in New York." [ECF No.

61 ("Transfer Opinion") 1].  The D.C. District Court construed the moving Defendants' motions to dismiss as motions to compel arbitration.  *See id.* at 3.  Applying the summary judgment standard applicable to such motions, the D.C. District Court found that "Smith has met his burden to show the existence of an agreement to arbitrate" with Hickey.  *Id.* at 5.  Although he recognized that Hickey "raise[d] . . . challenges to the arbitration provision's applicability," the Court found that the Arbitration Agreements delegated "gateway" questions of arbitrability to the arbitrator, *id.* at 5–7., and "Smith has a right to compel Hickey to present his claims to an arbitrator."  *Id.* at 7.

Notwithstanding these findings, the D.C. District Court concluded that he lacked authority to compel arbitration because the 2017 SPA and the 2021 ASPA contain forum selection clauses that provide for arbitration in New York City, and the FAA specifies that a court may compel arbitration only in its own district.  *Id.* at 7–8; *see Citigroup Glob. Markets Inc. v. All Children's Hosp., Inc.*, 5 F. Supp. 3d 537, 542 (S.D.N.Y. 2014) ("[T]he Federal Arbitration Act prevents a district court from compelling arbitration outside of its own district." (citing 9 U.S.C. § 4)).  Because of this limitation, the D.C. District Court ordered that the case be transferred to the Southern District of New York, reasoning that this District would have "authority under the FAA to enforce the parties' forum-selection clauses and compel arbitration."  Transfer Opinion 10–11.

In so ordering, however, the D.C. District Court recognized that "[s]ome Defendants are not parties to either the 2017 SPA or 2021 ASPA."  *Id.* at 10 n.3.  Although the Court noted that the doctrine of equitable estoppel *may* permit non-signatory Defendants to compel arbitration with a signatory, it did "not decide whether that doctrine applies here."  *Id.*  In addition, the Court acknowledged that Plaintiff Ulrich also is not a party to the Arbitration Agreements.  *Id.*  Despite these caveats, the D.C. District Court transferred the entire case,  reasoning that "[t]ransfer is justified even if only some Defendants could enforce the arbitration clauses," because it would be inefficient to bifurcate and "[o]ne court should resolve all claims."  *Id.* (internal quotation marks

omitted) (quoting *Edebiri v. N. Highland Co. LLC*, No. 1:20-CV-00758 (TNM), 2020 WL 5411303, at *2 (D.D.C. Sept. 9, 2020)). Thereafter, the case was transferred to the Southern District of New York and assigned to this Court. [ECF Nos. 62– 63].

Following transfer, Plaintiffs moved for leave to file a Second Amended Complaint. [ECF No. 80]. Plaintiffs filed a memorandum of law in support [ECF No. 80-1 ("Pl. Mem.")]. All Defendants opposed, filing three separate memoranda of law. [ECF Nos. 82-84]. Plaintiffs filed a reply. [ECF No. 86]. The Court granted Plaintiffs' motion, finding that the Transfer Opinion's limited holdings, including that "at least some of Hickey's claims must be presented to an arbitrator" and "[s]ome Defendants are *not* parties to either the 2017 SPA or 2021 ASPA" did not render an amended complaint futile. [ECF No. 89 ("SAC Opinion")].

Thereafter, Plaintiffs filed the operative Second Amended Complaint. [ECF No. 94 (the "SAC")]. The SAC asserts seventeen claims: (1) Defendants Smith and Phair breached their fiduciary duty to Plaintiffs regarding Kennedy BV (Count I); (2) Defendant Kennedy BV defrauded Plaintiffs (Count II); (3) Defendants Smith, Phair, Grillo, and Kennedy BV conspired to defraud Plaintiffs of the income distributions from Kennedy BV and Defendant Grillo knowingly and substantially aided and abetted Defendants Smith and Phair to conceal their breach of fiduciary duties owed to Plaintiffs (Count III); (4) the 2017 Agreement is void due to fraud in the factum (Count IV); (5) Passarelli, Smith, and Phair fraudulently misrepresented and concealed the 2017 Exchange Agreement (Count V); (6) Passarelli, Smith, and Phair breached their fiduciary duties to Plaintiffs (Count VI); (7) Passarelli, Smith, Phair, Grillo, and Park Avenue BV conspired to defraud Hickey by implementing a series of agreements between themselves to deceive Hickey and transfer Hickey's ownership interest in Park Avenue BV (Count VII); (8)-(12) Smith and Phair fraudulently misrepresented and concealed the ownership transfer of New York Avenue BV and diversion of Plaintiffs' income distributions from New York Avenue BV, Times Square BV, J.

Caldwell BV, Veronica BV, and White House BV (Counts VIII-XII); (13) Smith and Phair breached their fiduciary duties to Plaintiffs (Count XIII); (14) Passarelli aided and abetted Smith and Phair's fraudulent misrepresentation and concealment and breach of their fiduciary duties (Count XIV); (15) Smith, Phair, Grillo, Times Square BV, J. Caldwell BV, Veronica BV, New York Avenue BV, and White House BV conspired to defraud Hickey by diverting income distributions from these restaurants and by "transferring to themselves" all of Hickey's ownership interests in each of these restaurants (Count XV); (16) Smith, Passarelli, and Phair were unjustly enriched (Count XVI); and (17) Plaintiffs also frame a request for an equitable accounting related to the Bobby Van's Restaurants as a separate count (Count XVII).[3]

All Defendants moved to dismiss the Second Amended Complaint in three separate motions, each filing a memorandum of law in support. [ECF Nos. 116 ("Passarelli Mot."),[4] 117 ("Passarelli Mem."), 118 ("Phair Mot."), 119 ("Phair Mem."), 120 ("Smith Mot."),[5] 121 ("Smith Mem." and together with "Passarelli Mem." and "Phair Mem." "Def. Mems."). Plaintiffs filed a single opposition to the motions to dismiss [ECF No. 124 ("Pl. Opp.")]. Individual Defendants filed three separate reply briefs in further support of their motions. [ECF Nos. 126 ("Passarelli Reply"), 127 ("Phair Reply"), 128 ("Smith Reply")].

## LEGAL STANDARDS

Defendants move to dismiss this action on several grounds: the complaint fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the fraud claims fail to meet the

---

[3] Plaintiffs improperly mark this count as "Count XX" in the Complaint. *See id.* ¶¶ 198-200.

[4] Passarelli and Park Avenue BV filed this motion to dismiss together.

[5] Grillo and all Restaurant Defendants except for Park Avenue BV join in Smith's motion to dismiss.

heightened standards of Rule 9(b), claims should be dismissed or stayed pursuant to arbitration agreements, and the claims are time barred. Def. Mems.

Where a party has moved to dismiss pursuant to an arbitration agreement, courts have in certain situations converted a motion to dismiss to one to compel arbitration. *See Meridian Autonomous Inc. v. Coast Autonomous LLC*, 2018 WL 4759754, at *5 (S.D.N.Y. Sept. 30, 2018). A motion to compel is treated similarly to a motion for summary judgment. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). Generally, judicial conversion of a motion to dismiss to a motion to compel has been limited to situations where the party seeking dismissal has clearly indicated that it intends to compel arbitration. *See Meridian Autonomous Inc.*, 2018 WL 4759754, at *5 (citing *Nicosia*, 834 F.3d at 230). Under Second Circuit precedent, "it [is] proper not to construe [a] motion to dismiss as a motion to compel arbitration" where the motion "neither [seeks] an order compelling arbitration nor indicate[s] that [the defendant] w[ill] seek to force [the plaintiff] to arbitrate in the future." *Nicosia*, 834 F.3d at 230; *see also PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*, No. 14-CV-764 RJS, 2015 WL 1442487, at *3 n.2 (S.D.N.Y. Mar. 27, 2015) ("[Because] [n]either party seeks to compel arbitration . . . the Court declines to do so sua sponte.").

The D.C. District Court construed the prior motions to dismiss by the defendants in this case as motions to compel arbitration. *See* Transfer Opinion 3, 7–11. Moreover, in the pending motions, Defendants ask this Court to compel arbitration, though the motions are framed as motions to dismiss rather than motions to compel arbitration. *See* Smith Mot.; Phair Mot.; Passarelli Mot. Smith, Grillo, and all Restaurant Defendants except Park Avenue BV filed a motion to dismiss jointly and, together, argue that "[t]he Parties should be ordered to arbitration and all claims included herein should be stayed until the arbitration has concluded[.]" *See* Smith Mem. at 28-29. Phair argues that that "Hickey's [c]laims [a]gainst Phair [m]ust [b]e [a]rbitrated."

*See* Phair Mem. at 14-18. Finally, Passarelli Memorandum incorporates all arguments contained in the motions to dismiss filed by the other defendants "to the extent such arguments are also applicable to Passarelli and Park Avenue BV." *See* Passarelli Mem. at 5 n.2. As such, the Court construes Defendants' motions to dismiss as motions to compel arbitration.

Pursuant to Section 2 of the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of [the] contract . . . shall be valid, irrevocable, and enforceable." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228–29 (2d Cir. 2016) (quoting 9 U.S.C. § 2) (alterations in original). Accordingly, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original)).

## DISCUSSION

### I.    The Transfer Opinion Is Entitled to Deference as Law of the Case

The Law of the Case doctrine posits that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *See Musacchio v. United States*, 577 U.S. 237, 244-45 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). A court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" *Johnson v. Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)). Courts are generally "reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge or court." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (internal quotation marks and citation omitted); *see*

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). As such, the Court defers to the prior rulings of the D.C. District Court where applicable. However, as explained in the SAC Opinion—the opinion granting Plaintiffs leave to file a Second Amended Complaint—the holdings in the Transfer Opinion are limited in several respects, *see* SAC Opinion at 5–6, and as further explained below, the SAC frames issues that were not before the D.C. District Court, and that must be addressed here.

## II.    An Arbitrator Must Determine Whether Several Claims in this Case are Arbitrable

Plaintiffs' several claims largely involve Defendants' alleged misrepresentations about the meaning of the 2017 SPA, their concealment the purported effects of that Agreement, namely that Plaintiffs' shares in the Bobby Van's Restaurants were improperly taken from them and income distributions from the restaurants were withheld from them, and whether the 2021 ASPA resolved Hickey's claims with regard to the 2017 SPA that are now asserted here. Both the 2017 SPA and the 2021 ASPA have arbitration provisions and Defendants argue that the claims should be dismissed or stayed in favor of arbitration. *See* Smith Mem. at 28-29 ("The Parties should be ordered to arbitration and all claims included herein should be stayed until the arbitration has concluded[.]"); Phair Mem. at 14-18; Passarelli Mem. at 5 n.2 (incorporating the arguments contained in the motions to dismiss filed by the other defendants "to the extent such arguments are also applicable to Passarelli and Park Avenue BV.").

The Federal Arbitration Act ("FAA") provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to

proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

Courts in this Circuit follow a two-part test to determine whether claims are subject to arbitration, considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re American Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022). If the movant overcomes this burden, "[b]efore addressing the second inquiry, [the court] must also determine who—the court or the arbitrator—properly decides the issue." *In re American Exp.*, 672 F.3d at 128. While the question of "whether the particular dispute is subject to an arbitration agreement is typically an issue for judicial determination," an exception to that general rule applies if the arbitration agreement "clearly and unmistakably elects to have the resolution of the arbitrability of the dispute decided by the arbitrator." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019) (internal quotation marks omitted). Should the court find that the issue of arbitrability is for its own determination, at the second step, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

## A.    Hickey, Phair, and Smith Entered into Valid Agreements to Arbitrate

In the Transfer Opinion, the D.C. Court held that under New York law, both the 2017 SPA and 2021 ASPA include valid agreements to arbitrate; '[i]t is undisputed that Hickey signed the 2017 SPA and 2021 ASPA and he does not otherwise challenge the formation of the contracts." Transfer Opinion at 5.  The D.C. Court correctly states that in New York, "[t]o form a binding contract there must be a meeting of the minds, such that there is a manifestation of mutual assent

sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* (quoting *Stonehill Cap. Mgmt., LLC v. Bank of the West*, 68 N.E.3d 683, 689 (N.Y. 2016)). It further holds that Hickey's signature is a manifestation of mutual assent under New York law. *Id.* (citing *Lewis v. ANSYS, Inc.*, No. 19-cv-10427, 2021 WL 1199072, at *5 (S.D.N.Y. March 30, 2021) ("[I]f a party signs or otherwise assents to an agreement with an arbitration provision, they will be bound by it even if they did not read it.").

At the time the Transfer Opinion was decided, Hickey had not disputed the validity of the contracts. *Id.* at 5. Now, in their Second Amended Complaint, and in their opposition to the pending motions, Plaintiffs argue that the 2017 SPA is void for three reasons: (a) the 2017 SPA is void ab initio as a result of fraud in the factum, *see* SAC ¶¶ 38, 42(f), 106-121, Pl. Opp. at 20-23, (b) alternatively Hickey was fraudulently induced to sign the 2017 SPA, *see* SAC ¶¶ 118, 121, Pl. Opp. at 1, 3 and (c) the 2017 SPA was "voided by the parties (including the arbitration provision therein)" through the 2021 ASPA. *See* Pl. Opp. at 21-22. None of these arguments present a "cogent and compelling" reason to depart from the finding of the D.C. District Court (*see* Transfer Opinion at 5) that the parties have entered into a valid agreement to arbitrate. *See Johnson v. Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) (A Court "may depart from the law of the case for 'cogent' or 'compelling' reasons"). Moreover, Plaintiffs do not challenge the validity of the agreement to arbitrate in the 2021 ASPA, instead arguing only that the present dispute does not fall within the scope of that agreement to arbitrate. *See* Pl. Opp. at 22-24.

i.    The 2017 SPA is Not Invalidated by Reason of
      Fraud in the Factum or Fraud in the Inducement

Challenges to the validity of arbitration agreements under contract law can be divided into two types. Where Plaintiffs allege fraud in the factum, they are arguing that the 2017 SPA is "void" and it "produce[d] no legal obligation." *See Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005).

15

Where Plaintiffs allege fraudulent inducement, they are alleging that the 2017 SPA is "voidable." *Id.* ("An agreement entered into through fraud in the inducement is an example of a 'voidable' contract."). "If a contract is 'void,' a party wishing to avoid arbitration does not have to challenge the arbitration clause specifically; if a contract is 'voidable,' the party must show that the arbitration clause itself is unenforceable." *See Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005) (citing *Prima Paint Corp. v. Flood & Conklin Manufacturing*, 388 U.S. 395, 402 (1967), and citing *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 67–68 (2d Cir.2005)).

Plaintiffs' allegation that the entire 2017 SPA, including the arbitration clause, is void due to fraud in the factum or fraud in the execution fails. Fraud in the factum exists when a signatory to a contract is tricked into believing that which he is signing is something other than a binding contract. *See Nowak v. JPMorgan Chase & Co.*, 847 F. App'x 31, 35 (2d Cir. 2021) (quoting *Revak v. SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994)). Fraud in the factum occurs in those "'rare cases' where 'the misrepresentation is regarded as going to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect.'" *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (quoting *Revak v. SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994)). Here, Plaintiffs allege that Hickey was tricked into signing the 2017 SPA based on several misrepresentations by Smith and Phair about what the legal effect of the 2017 SPA would be. Specifically, Plaintiffs allege that Smith and Phair told Hickey that the SPA was an option contract rather than a contract to purchase Mr. Hickey's shares. SAC ¶¶ 35-38. Plaintiff does not allege, however, that he did not believe the 2017 SPA was in fact a binding contract. In fact, Hickey admits that he knew it was a contract. SAC ¶ 42.

Plaintiffs cite a slightly different articulation of the standard for fraud in the factum. They state that "fraud in the factum, occurs where a party signs something very different from what he

was told he was signing." Pl. Opp. (citing *Schaeffer v. Kessler*, No. 12-cv8576 (PKC) (S.D.N.Y. March 20, 2013) and citing *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 31 (2d Cir. 1997)). However, Plaintiffs ignore the second element of this version of the standard. In this formulation, fraud in the factum occurs where (1) "there is a misrepresentation as to the character or essential terms of a proposed contract," and (2) "a party signs without knowing or having a reasonable opportunity to know of its character or essential terms." *See Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 31 (2d Cir. 1997). Even under this formulation, fraud in the factum "is only a defense to enforcement where the signer was not negligent in failing to read the document he signed." *See Schaeffer v. Kessler*, No. 12 CIV. 8576 PKC, 2013 WL 1155587, at *7 (S.D.N.Y. Mar. 20, 2013). A signer may not be negligent for failing to read the contract where, for example, the signer is illiterate, blind, or not a speaker of the language in which the document is written or where the document was surreptitiously switched for another. *See, e.g.*, *Countrywide Home Loans, Inc. v. Gibson*, 157 A.D.3d 853, 856 (2d Dep't 2018); *Anderson v Dinkes & Schwitzer, P.C.*, 150 A.D.3d 805, 806 (2d Dep't 2017); *Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art*, 324 F. App'x 117, 120 (2d Cir. 2009) (citing *Hetchkop*, 116 F.3d at 32). Plaintiffs do not allege that Mr. Hickey was in any way prevented from reading and understanding the contract. Accordingly, Plaintiffs fail to allege that the 2017 SPA is void due to fraud in the factum.

ii.    <u>Plaintiffs Fail to Show That the Arbitration Agreement<br>is Invalidated by Fraudulent Inducement</u>

Plaintiffs do not claim fraud in the inducement as a separate count in their Second Amended Complaint. However, Plaintiffs claim throughout the SAC and their Opposition to the Motions to Dismiss that Hickey was fraudulently induced to sign the 2017 SPA. *See* SAC ¶¶ 118, 121, Pl. Opp. at 1, 3. To avoid the application of an arbitration agreement by reason of fraud in the inducement, Plaintiffs must show that the arbitration clause itself was induced by fraud. *See Adams*

*v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005) (citing *Prima Paint Corp. v. Flood & Conklin Manufacturing*, 388 U.S. 395, 402 (1967). A valid claim that a Plaintiff was fraudulently induced to sign a contract including an arbitration provision "does not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010). "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Id.* Plaintiffs allege that Smith and Phair made several misstatements to induce Hickey to sign the SPA but makes no allegation that he was specifically fraudulently induced to agree to the arbitration provision. SAC ¶¶ 116-118; Pl. Opp. 1-4. Accordingly, without deciding whether Plaintiffs state a claim for fraudulent inducement to contract, Plaintiffs fail to allege that the arbitration clause in the 2017 SPA is invalid based on fraudulent inducement.

iii.    The Arbitration Provision in the 2017 SPA
        Was Not Voided by the Parties

Plaintiffs further argue that the arbitration provision in the 2017 SPA is void because the entire 2017 SPA subsequently was "voided by the parties" when Smith and Hickey signed the 2021 ASPA. *See* SAC ¶¶ 59, 60; Pl. Opp. at 21-22. "When deciding whether the parties agreed to arbitrate a certain matter," a district court must "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). As such, "contracting parties are free to revoke an earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration." *See Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011); *see also Ottawa Off. Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F. Supp. 2d 215, 219 (S.D.N.Y. 2001) ("It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supercedes [sic] the old agreement."). However, to revoke an agreement to arbitrate, the superseding contract must "stand[] in direct conflict" with the arbitration provision in the first

agreement. *Compare Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011) (finding a provision requiring adjudication of claims arising from the second contract directly conflicted with and superseded an arbitration clause in the first contract) *with Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278 (2d Cir. 2005), *abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287 (2010) (finding a forum selection clause was "complementary" to an arbitration agreement).

Here, both contracts include agreements to arbitrate that do not stand in direct conflict with one another. Further, Phair was not a party to the 2021 ASPA and thus it was not a new agreement between the same parties and cannot deprive Phair of his right to arbitrate. Thus, Plaintiffs fail to allege that the arbitration agreement in the 2017 SPA was "voided by the parties."

Plaintiffs made a similar allegation in the First Amended Complaint, and so argued before the D.C. Court. Plaintiffs alleged that "[i]n May 2018, Smith informed Hickey that there would be no more payments under the 2017 Option Agreement and Smith and Phair were terminating that agreement." FAC ¶ 42. Though Plaintiffs do not address this argument in their opposition to the pending motions to dismiss, Plaintiffs allege again in the SAC that the 2017 SPA was "voided" because "Smith informed Hickey that Smith and Phair were terminating the 2017 Option Agreement and that they would not pay Hickey anything beyond the $100,00 that had already been paid for the Park Avenue BV Option right." SAC ¶ 45.  The D.C. Court acknowledged that Plaintiffs contended the 2017 SPA "has been cancelled, terminated, and expired for several years now," and construed the challenges as a presenting a "question[] of arbitrability." *See* Transfer Opinion at 5-6. However, the Second Circuit construes the issue of "whether an arbitration agreement remains in force," as a gating question of the validity of an arbitration agreement, rather than a question of the arbitrability of the claims. *See Goldman, Sachs & Co. v. Golden Empire Sch.*

*Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014). As such, for completeness, the Court addresses Plaintiffs' argument here.

Assuming, without deciding, that the 2017 SPA did create an option for Phair and Smith to purchase Hickey's shares in Bobby Van's restaurants, their failure to exercise the alleged option did not render the entire agreement void. Instead, "[a]n option contract is an agreement [by the optionor] to hold an offer open; it confers upon the optionee, for consideration paid, the right to purchase at a later date." *Kaplan v. Lippman*, 75 N.Y.2d 320, 324 (1990); *see also* Restatement (Second) of Contracts § 87 ("An offer is binding as an option contract if it (a) is in writing and signed by the offeror, recites a purported consideration for the making of the offer, and proposes an exchange on fair terms within a reasonable time."). The party with the right to exercise the option is under no obligation to exercise the option and does not render the agreement void upon failure to do so. *See Kaplan*, 75 N.Y.2d at 324 ("until the optionee gives notice of his intent to exercise the option, the optionee is free to accept or reject the terms of the option."). Here too, Plaintiffs fail to show that the 2017 SPA was "voided by the parties."

Plaintiffs do not challenge the validity of the 2021 ASPA arbitration agreement and their remaining arguments against arbitration focus only on the scope of the 2021 ASPA. Pl. Opp. at 23-24. Accordingly, the Court concludes 2017 SPA and 2021 ASPA both include valid agreements to arbitrate.

**B.    The Arbitration Clause Delegates Issues of Arbitrability to the Arbitrator**

The second question in the two-part test to determine whether claims are subject to arbitration is "whether the dispute at issue comes within the scope of the arbitration agreement." *In re American Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). Ordinarily courts, not arbitrators, decide "gateway . . . question[s] of arbitrability." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). However, in the Transfer Opinion, the D.C. Court held that both

arbitration clauses delegate issues of arbitrability to the arbitrator. *See* Transfer Opinion at 6-7. Where a contract contains a valid delegation of arbitrability to the arbitrator, "such a clause will be enforced absent a specific challenge to the delegation clause by the party resisting arbitration." *Monarch Consulting, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 26 N.Y.3d 659, 675–76, 47 N.E.3d 463, 474 (2016) *(citing Rent–A–Center*, 561 U.S. at 71–72). Notwithstanding the specific ruling by the D.C. District Court that issues of arbitrability are delegated to the arbitrator, Plaintiffs again argue here that their claims are not arbitrable. *See* Pl. Opp. at 23–24.

This Court finds no "cogent" or "compelling" reason to depart from the law of the case. *See Johnson*, 564 F.3d at 99–100. Plaintiffs are on notice that the law of the case is that questions of arbitrability are delegated to an arbitrator, *see* Transfer Opinion at 6-7, SAC Opinion at 2-3, and do not challenge this holding. As such, the Court will not address Plaintiffs' arguments regarding the scope of the 2021 ASPA arbitration provision, *see* Pl. Opp. at 23-24, and the contract provisions delegating of questions of arbitrability will be enforced.

## C. Several Non-Signatories and Signatories to the 2021 ASPA and the 2017 SPA May Enforce their Arbitration Clauses

There are eleven defendants in this case, only two of whom—Smith and Phair—are signatories to the relevant arbitration agreements. *See* SAC, Exhibits 1 & 3. The other defendants are shareholder Passarelli, accountant Grillo and the several Bobby Van's restaurant entities. *See* SAC ¶¶ 3-13. Further, Plaintiff Ulrich is not a signatory to either arbitration agreement.

All defendants here, including non-signatories, appear to assert the right to arbitrate the present claims against them. Phair (a signatory) filed his own motion to dismiss and argues that "Hickey's [c]laims [a]gainst Phair [m]ust [b]e [a]rbitrated." *See* Phair Mem. at 14-18. Passarelli and Park Avenue BV, jointly filed a motion to dismiss and separately, Smith (a signatory), Grillo and the rest of the Restaurant Defendants jointly filed their own motion to dismiss. *See* Passarelli

Mot., Smith Mot, respectively. The Smith movants collectively assert that "[t]he Parties should be ordered to arbitration and all claims included herein should be stayed until the arbitration has concluded[.]" Smith Mem. at 28. The Passarelli movants do not assert explicitly that the claims should be arbitrated, but they do incorporate all arguments in the other two motions to dismiss "to the extent such arguments are also applicable to Passarelli and Park Avenue." Passarelli Opp. at 5 n.2. Plaintiffs, for their part, do not concede that their claims are subject to arbitration. *See* Pl. Opp. at 20–24. They argue throughout their opposition that the arbitration agreements are void, and alternatively, that the arbitration provisions do not cover the present claims. *See id.*

Since the D.C. Court determined that questions of arbitrability are delegated to the arbitrator and this Court has determined that Hickey, Phair, and Smith entered into valid agreements to arbitrate, each claim asserted by Hickey, a signatory, against Phair and Smith, both signatories, must be submitted to an arbitrator. *See* SAC ¶¶ 106-176, 185-200 (Counts IV-XIII, XV-XVII, to the extent they are asserted against Phair and Smith). However, the D.C. Court did not reach a conclusion on whether any non-signatory parties are subject to either arbitration agreement. *See* Transfer Opinion at 10 n.3. Instead, he expressly left the issue open for further resolution.[6] Because neither arbitration clause here explicitly vests any rights in non-signatories, the Court proceeds to analyze whether claims involving non-signatories must be submitted to an arbitrator.

---

[6] Judge McFadden noted: "Some Defendants are not parties to either the 2017 SPA or 2021 ASPA. The doctrine of equitable estoppel permits 'a non-signatory [to] compel arbitration with a signatory when the non-signatory is seeking to resolve issues that are intertwined with an agreement that the signatory has signed.' *Sakyi*, 308 F. Supp. 3d at 385. This Court need not decide whether that doctrine applies here." *See* Transfer Opinion at 10 n.3; *see also* SAC Opinion at 7 ("[A Second Amended Complaint and subsequent motions to compel arbitration] will afford the parties the opportunity to properly brief questions of contract formation, *see* Pl. Reply 3–10, and the applicability of the Arbitration Agreements to non-signatory parties, *see* Transfer Opinion 10 n.3. The Court takes no position as to either issue on the current record.").

Generally, federal law "does not require parties to arbitrate when they have not agreed to do so[.]" *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995). However, a signatory to an arbitration agreement may be required to arbitrate a dispute with a non-signatory either when (1) the arbitration clauses "explicitly vests rights to arbitrate," in non-signatories or (2) (a) "the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed" and (b) there is a "relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 404 (2d Cir.2001); *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d. Cir.2008); *Citadel Servicing Corp. v. Castle Placement, LLC*, 431 F. Supp. 3d 276, 287 (S.D.N.Y. 2019).

The several claims involving non-signatories here can be divided into two groups: (1) claims brought by Ulrich, a non-signatory, involving the shares of Kennedy BV and distributions allegedly owed to Hickey's minor children from Kennedy BV, *see* SAC ¶¶84-105 (Counts I-III), and (2) claims brought by Hickey, a signatory, against non-signatories, involving shares of the other restaurants and distributions allegedly owed Hickey by those restaurants, *see* SAC ¶¶ 122-146, 177-200 (Counts V-VII, XIV-XVII).[7]

---

[7] Plaintiffs use of the word "Plaintiffs" rather than Ulrich or Hickey throughout their description of the numerous claims in the Second Amended Complaint in a way that confuses which Plaintiff is bringing which claim. *See, e.g.*, SAC ¶ 101 ("Smith, Phair, Grillo, and Kennedy BV conspired to defraud Paintiffs of the income distributions from Kennedy BV . . . since 2017."). However, since Hickey transferred all of his 24% ownership interest in Kennedy BV to his two minor children with Plaintiff Ulrich as their guardian in 2014, *see* SAC ¶ 27, the court has construed claims involving Kennedy BV as brought by Ulrich and claims involving shares involving other Bobby Van's restaurants as brought by Hickey.

The Ulrich claims, brought by a non-signatory, allege fraud against both signatories, Smith and Phair, and non-signatories, Grillo and Kennedy BV, for failure to pay distributions and concealment of earnings. *See* SAC ¶¶84-105 (Counts I-III). Hickey transferred all of his 24% ownership interest in Kennedy BV to his two minor children with Plaintiff Ulrich as their guardian in 2014, well before either the 2017 SPA or the 2021 ASPA were signed. *See* SAC ¶ 27. Both contracts on their face involve only Hickey's shares of the Bobby Van's restaurants and do not involve the children's shares in Kennedy at all. *See* SAC, Exhibits 1 & 3. Accordingly, the Ulrich claims are not sufficiently "intertwined" with either agreement such that Counts I, II, or III must be arbitrated.

Each of Hickey's claims against non-signatories, on the other hand, rests entirely on Hickey's contention that the 2017 SPA did not transfer, or should not have transferred his shares in the Bobby Van's restaurants to Phair and Smith and that the 2021 ASPA did not resolve Hickey's claims involving the effect of the 2017 agreement. *See* SAC ¶¶ 61-62, 122-152, 177-200. The claims are deeply intertwined with both contracts, and in fact, their merit is largely dependent on the textual interpretation of the contracts. *See Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 407 (2d Cir. 2001) (holding a non-signatory could compel arbitration where the dispute at issue "turns upon" the provisions of the contract including the arbitration agreement and thus the dispute was "linked textually" to the contract).

Further, most of the non-signatories against whom Hickey brings these claims has a relationship to Hickey that "justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate." *See Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 404 (2d Cir.2001). The Second Circuit has applied estoppel against a party seeking to avoid arbitration most often when the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party;

they are often subsidiaries, affiliates, agents, and other related business entities. *See Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 209 (2d Cir.2005); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004); *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l., Inc.*,198 F.3d 88, 97 (2d Cir.1999) (compelling plaintiff to arbitration where "it treated a group of related companies as though they were interchangeable").

Here, Passarelli is a fellow founder and shareholder, with Hickey, Smith and Phair, of the Bobby Van's restaurants at issue. The various restaurants—Times Square BV, J. Caldwell BV, Veronica BV, New York Avenue BV, White House BV, and Park Avenue BV—are largely the subject of the 2017 SPA and 2021 ASPA, are owned jointly by the signatories of the Agreements. Each is a defendant in the case. The Restaurant Defendants are closely-held by Passarelli, Smith, Phair and, allegedly, Hickey, and are each closely related business entities, subject to both Agreements. Grillo, however, acting as an accountant, CPA, financial advisor, and business consultant for Bobby Van's Restaurants and Smith, does not have such a close corporate relationship as to render him akin to a party to either Agreement. Accordingly, here all non-signatory Defendants, except Grillo may seek arbitration of the Counts V-VII, XIV-XVII—"even if, in the end, an arbitrator were to determine that the dispute itself is not arbitrable because [Defendant] cannot claim rights under the" Agreements or their Arbitration Clauses. *See Contec*, 398 F. 3d at 209.

Accordingly, Hickey's claims against Phair, Smith and non-signatory defendants other than Grillo—Counts IV through XVII—are all stayed pending an arbitrator's decision on their arbitrability. Conversely, claims brought by Ulrich—Counts I through III—and claims brought by Hickey against Grillo—Counts VII, XV, XVI, XVII—are justiciable.

**D.      The Case is Stayed Pending Arbitration**

When a district court finds that all claims in a lawsuit should be referred to arbitration, and a party requests a stay pending arbitration, Section 3 of the FAA compels the court to stay the lawsuit. *See Smith v. Spizzirri*, 601 U.S. 472, 475 & n.1, 478 (2024) ("The [FAA's] choice to provide for immediate interlocutory appeals of orders denying—but not of orders granting—motions to compel arbitration is consistent with Congress's purpose in the FAA to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible.") (cleaned up); *see also Dylan 140 LLC v. Figueroa*, 982 F.3d 851, 858 n.2 (2d Cir. 2020) ("[C]ourts should stay litigation pending arbitration to avoid converting an otherwise-unappealable interlocutory stay order into an appealable final dismissal order, thus enabling parties to proceed to arbitration directly.") (cleaned up).

If some, but not all, claims are subject to arbitration, however, the court must "sever those claims subject to arbitration from those adjudicable only in court," *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995), and determine "whether to stay the balance of the proceedings pending arbitration," *see Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008); *see also Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 408-9 (S.D.N.Y. 2016). A court may also "sever even a part of a claim, where that claim raises both arbitrable and non-arbitrable issues." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). The decision to stay proceedings "is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration.").

Here, certain defendants did in fact request that "all claims herein should be stayed until the arbitration has concluded." *See* Smith Mem. at 28 (citing *Smith v. Spizzirri*, 601 U.S. 472). As described above, most, but not all, claims in this case are subject to arbitration. Still, several of the

arbitrable and non-arbitrable claims are so intertwined that the entire proceeding should be stayed for the purpose of judicial economy. Further, courts in this district have reasoned that "[a] stay is particularly appropriate where, as here, the parties must arbitrate the question of arbitrability, since any claims that the arbitrator determines are not arbitrable would proceed before this Court." *Kuehne + Nagel Inc. v. Hughes*, No. 21-cv-8470, 2022 WL 2274353, at *8 (S.D.N.Y. June 23, 2022); *Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21CV10377ATKHP, 2022 WL 987665, at *6 (S.D.N.Y. Apr. 1, 2022). Accordingly, the Court stays all proceedings in this action pending arbitration.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss or to stay in favor of arbitration is GRANTED and this case is STAYED pending arbitration. The Clerk of Court is respectfully requested to terminate the motions pending at docket entries 116, 118, and 120 and to stay this case.


**SO ORDERED.**


**Date:  March 3, 2025**                                    **MARY KAY VYSKOCIL**
**New York, NY**                                    **United States District Judge**